UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: | Bankruptcy No. 16-30652 |
| Darrell H. Vasvick and | |
| Susan M. Vasvick, | Chapter 7 |
| Debtors. / | |
| Kip M. Kaler, | |
| Bankruptcy Trustee, | |
| Plaintiff, | |
| v. | Adversary No. 17-7017 |
| Darrell H. Vasvick, Susan M. Vasvick | |
| and Justin Vasvick, | |
| Defendants. / | |

**MEMORANDUM AND ORDER**

**I.   INTRODUCTION**

Bankruptcy Trustee Kip M. Kaler filed a Complaint alleging Debtors/Defendants Darrell H. and Susan M. Vasvick's transfer of real property located at 1509 17th Street South, Fargo ("the Property")[1] to their son, Defendant Justin Vasvick, resulted in unjust enrichment warranting the imposition of a constructive trust on the Property (Count I). Doc. 1.  The Trustee also seeks a declaratory judgment: (1) ruling that Debtors, who have resided in the Property since 1976, retained the equitable interest in the Property despite transferring the legal interest to their son, and (2) finding that the Property is

---

[1] The legal description of the Property is:  Lot 3, Block 3, replat of Harold A. Johnson's First Addition to the City of Fargo, Cass County, North Dakota.

1

property of the bankruptcy estate (Count III).  Id.  Additionally, the Trustee seeks turnover of the Property (Count IV).  Id.  In the alternative, the Trustee alleges that Debtors "performed or caused to be performed $24,041.96 worth of improvements to the Property" he claims are avoidable as fraudulent transfers under 11 U.S.C. § 548 (Count II).  Id.

Defendants filed an Answer, claiming the Trustee failed to state a cause of action for which relief may be granted and asserting that the Trustee's claims are barred by the applicable statute of limitations.  Doc. 4.

On March 1, 2018, Defendants filed a Motion for Partial Summary Judgment that the Trustee opposed.  The Court found that evidence offered by the Trustee relating to transactions between the parties after Debtors transferred the Property to Justin Vasvick raised questions of fact bearing on the elements of unjust enrichment and whether imposition of a constructive trust is an appropriate remedy.  Doc. 28.  The Court also found the Trustee's claims were not barred by the statute of limitations the Defendants asserted as a defense.  Id.  Consequently, the Court denied Defendants' motion.  Id.

At the request of the parties, the Court bifurcated the Trustee's claims.  Specifically, it continued trial on the fraudulent transfer claim, and the parties tried Counts I, III and IV to the Court on May 15 and 16, 2018.  For the reasons discussed below, the Court finds in favor of Defendants and dismisses Counts I, III and IV of the Complaint.  The Clerk shall schedule a status conference to discuss scheduling a trial on Count II.

2

**II.    BACKGROUND**

Debtors purchased the Property in 1976 and have lived there ever since. In 2005, Debtors refinanced the debt secured by the Property and granted a mortgage to Popular Finance Services in the sum of $186,400. Ex. T-4. Wynn Appraisals, Inc. performed an appraisal at the time of refinance and estimated that the value of the Property was $233,000 in June 2005. Ex. T-1. Assuming the appraisal was accurate, Debtors held $46,600 in equity in the Property in 2005.

In 2006, Debtors began experiencing financial difficulties associated with a business they owned, 3-D Printing. In 2006 or early 2007, the business ceased operations. Darrell Vasvick and two other individuals owed over $500,000 to the Small Business Administration. After 3-D Printing went out of business, Darrell Vasvick was unemployed for eight months.

At about the same time, Debtors determined they could not afford to stay current on their monthly mortgage payments on the Property. They began talking about moving their residence to a Minnesota lake home they owned with Susan Vasvick's brother and his wife, Steve and Pam Zinniel.[2] Defendants claim Justin Vasvick overheard Debtors' conversation about moving to the lake home and approached them about purchasing the Property.[3]

---

[2] Darrell Vasvick testified that Debtors moved to the lake home in 2007 and changed their permanent residence to Minnesota for tax purposes. According to Debtors, they lived at the lake home for only a short period of time. Due to the cost of gasoline and the amount of time they spent commuting to work, Debtors moved back to the Property shortly after Justin Vasvick purchased it.

[3] The Trustee argued that Debtors and Justin Vasvick entered into an agreement providing that Justin Vasvick would purchase the Property from Debtors to protect the asset from creditors. Doc. 38 at 2, 8-9. To support this argument, he offered testimony from the Zinniels. Although uncertain about specific details, Pam Zinniel testified that

On April 30, 2007, Debtors conveyed the Property to Justin Vasvick via warranty deed.  SUF ¶ 4, 5.  On the same day, Justin Vasvick executed a note promising to repay Homecoming Financial, LLC the sum of $205,000, the appraised value of the Property.[4]  To secure the note, Justin Vasvick granted Homecoming Financial, LLC a mortgage against the Property.  Justin Vasvick paid $210,105.82 for the Property, including $5,105.82 in settlement charges.  SUF ¶ 4.  Debtors used the proceeds they received to satisfy the existing balance of their mortgage on the Property, which totaled approximately $194,000 at the time of transfer.[5]  SUF ¶ 6.  The Cass County Recorder recorded a "Satisfaction of Mortgage" on May 25, 2007.  Ex. T-5.

Despite selling the Property to Justin Vasvick, Debtors continued to live at the Property.[6]  According to Defendants, Debtors and Justin Vasvick negotiated an oral rental agreement.  Under the terms of the purported agreement, Debtors agreed to pay Justin Vasvick $1,500 per month for rent because this sum was close to the sum of Justin Vasvick's mortgage payment plus taxes, mortgage insurance and homeowner's insurance.  Defendants also considered $1,500 to be "fair rental value" based on

---

"sometime in 2007 or 2008" Darrell Vasvick told her he put the house "in Justin's name" because he was having financial difficulty and, if he ever had to file bankruptcy, the house would be secure.  Steven Zinniel testified that he recalled the conversation and reiterated Pam's account.

[4] Carter G. Wynne with Wynn Appraisals estimated that the value of the Property was $205,000.  The effective date of the appraisal was February 20, 2007.  Ex. T-2.

[5] The parties provided no evidence of the disposition of the $11,000 of equity in the Property at the time of the transfer, but Darrell Vasvick and Justin Vasvick testified that the full value inured to the benefit of Debtors either through the payment of sale costs or profit to Debtors.

[6] Justin Vasvick also resided at the Property until 2014.

4

advertisements of homes and apartments for rent in the Forum of Fargo-Moorhead, the local newspaper.

According to Darrell Vasvick, Debtors could not afford to pay the full $1,500 rent payment at the beginning of Defendants' agreement. If Debtors were unable to make the full rent payment in any month, Justin Vasvick accepted the sum Debtors could afford with the understanding that Debtors would pay the remaining balance due sometime in the future. Defendants did not keep a contemporaneous written accounting of arrearages owed.[7]

This oral agreement continued until November 2013 when Debtors entered into a written lease agreement with Justin Vasvick and his wife, Jessica Vasvick. Ex. T-20. The written lease is a month-to-month periodic tenancy requiring Debtors to pay rent of $1,300 per month. Debtors were still paying $1,300 per month in rent pursuant to the terms of the written lease at the time of trial.

The parties offered extensive records and testimony regarding the history of rent and promissory note payments on the debt secured by the Property.[8] From May to December 2007 (with the exception of August), Debtors paid Justin Vasvick $500 per month for rent because they could not afford to pay the entire $1,500 per month. Exs. T-23, T-25. In 2008, Debtors paid Justin Vasvick $1,604.00 for January rent; $1.626.26

---

[7] In preparation for trial, Defendants reviewed check blanks and bank statements to calculate the arrearage Debtors owed to Justin Vasvick. Defendants claim that Debtors were in arrears to Justin Vasvick from 2007 through 2014. By May 2018, Debtors paid the arrearage and were entitled to a credit on rent in the sum of $2,566.[7] Ex. T-23.

[8] The Court received check register data for some of the months between 2007 and 2010, bank statements from 2011 to the present and certain credit card statements. See Exs. T-25, 26, 28, 29, 30.

5

for April rent; and $1,628.32 in October and November. Exs. T-23, T-25. Debtors paid Justin Vasvick's lender $1,628.32 in December 2008. In 2009 and 2010, Debtors paid rent to Justin Vasvick for most months,[9] writing checks in sums ranging from $1,578.49 to $1,692.67 per month. Ex. T-23. Justin Vasvick recalled making the payments to his lender from 2007-2010, though he provided documentation of only four checks that he personally signed. See Ex. T-25 pp. 200, 201, 203, 205.

Beginning in 2011, the bank statements show a general pattern in which Darrell Vasvick transferred funds by writing a check from Debtors' checking account to the joint checking account he held with Justin Vasvick at State Bank & Trust (the "Joint Account"). Exs. T-27, T-26. Darrell Vasvick then paid Justin Vasvick's mortgage lender from the Joint Account.[10] Ex. T-27. As before, these payments included the promissory note payment, taxes, mortgage insurance and homeowner's insurance. Defendants maintained this arrangement until May 2013, when Darrell Vasvick began paying the lender directly by writing checks from Debtors' checking account or electronically transferring funds from Debtors' checking account to the lender. Ex. T-23. Darrell Vasvick continued this practice until September 2016, when Justin and Jessica Vasvick decided to stop using the Joint Account for rent and promissory note payments. See

---

[9] There is no evidence that Debtors paid rent to Justin Vasvick in August or November 2009, but Debtors made two rent payments in October 2009. In March 2009, Darrell Vasvick paid Justin Vasvick's lender directly. In 2010, Debtors paid rent to Justin Vasvick for every month except March. Exs. T-23, T-25.

[10] Both Darrell and Justin Vasvick were signors on the Joint Account, but Justin Vasvick made the payments to the lender only three times from January 2011 to April 2013: March 2011, April 2011 and April 2012. Ex. T-27. Darrell Vasvick made the payments from the Joint Account for the remaining months. Ex. T-27.

6

Ex. T-23.  Instead, Justin and Jessica Vasvick began using the Joint Account for savings and emergency purposes only.

In October 2016, Justin Vasvick and Darrell Vasvick opened a new joint account at Gate City Bank.  Ex. T-30.  From October 2016 to May 2018, Darrell Vasvick transferred $1,300 each month from Debtors' checking account to the new joint account at Gate City Bank.  In November 2016, either Darrell Vasvick or Justin Vasvick made arrangements for monthly automatic electronic payments from the new joint account to Justin Vasvick's lender.  Ex. T-30.

Defendants admitted that Debtors rarely paid Justin Vasvick the exact amount owed under the terms of either the verbal rental agreement or the written lease until after October 2016.  Instead, Debtors typically paid the exact amount due under the promissory note secured by the Property.  For example, from August 2013 to February 2014, Darrell Vasvick made monthly payments of $1,589.73 from Debtors' checking account directly to Wells Fargo rather than paying Justin Vasvick the sum Debtors owed him under the terms of their agreements ($1,500 prior to November 2013 and $1,300 after November 2013).  See Exs. T-23, T-26.

In May 2014, Justin Vasvick made arrangements with a new lender to refinance his debt secured by the Property, which totaled $204,000 in May 2014.  Under the terms of the new promissory note, Justin Vasvick's lender charged a lower interest rate and eliminated charges for private mortgage insurance, resulting in a lower monthly payment of $1,119.47.  After Justin Vasvick refinanced the debt, Darrell Vasvick began paying the new lender $1,119.47 per month, the exact amount of the note payment

7

rather than paying Justin Vasvick the $1,300 per month required by the written lease. Exs. T-26, T-23.

From May 2007 (the month after Debtors sold the Property to Justin Vasvick) to May 2018, Debtors paid a total of $164,035.83 in rent. In addition to rent, Debtors occasionally paid real estate taxes and homeowner's insurance directly, even though the rent payment supposedly included these expenses.[11] Debtors also typically paid expenses necessary to maintain the property, and they incurred significant expenses on major repairs and renovations. In 2015 and 2016, Debtors paid Rokke Construction a total of $23,302.96 for repairs to the deck and roof. Exs. T-22, T-28 p. 591. In 2015, Debtors spent $9,680 on carpet, materials and installation to replace carpet their dog ruined. Exs. T-23, T-21, T-28 at 606. In summary, Debtors spent a total of $200,746 related to the Property from May 2007 to May 2018, itemized as follows:

- $164,035.83 rent
- $263.21 real estate taxes (See n.12)
- $3,464.00 homeowner's insurance (2015 and 2016)
- $32,982.96 repairs and renovations

While the parties offered extensive records of the payments Debtors made related to the Property, the record does not include documentation of all of Justin

---

[11] Justin Vasvick reimbursed Debtors for some of these expenses. For example, Debtors paid $2,844.51 in real estate taxes on December 31, 2014 (check #4466, cleared on January 1, 2015). Ex. D-127. Debtors also paid $3,030.70 in real estate taxes on December 30, 2015 (check #4382, cleared on January 3, 2016). Ex. D-129. On May 12, 2015, Justin Vasvick deposited $3,712.00 into Debtors' checking account. Ex. T-26 at 362. On July 13, 2015, Justin Vasvick paid $300 to Debtors and, on April 26, 2016, he paid $1,600 to Debtors. Ex. T-26 at 375, 429.

8

Vasvick's payments. For example, the Court received written documentation substantiating only six payments Justin Vasvick made to the mortgage company for the years 2007 through 2010. Ex. T-23. Justin Vasvick testified that he made all the payments during those years, however. Additionally, trial exhibits and summaries show that the large majority of these payments were made. See Exs. T-10; D-142, D-143. Justin Vasvick still owns the Property, and there is no evidence Justin Vasvick has ever missed a payment or otherwise defaulted on his mortgage-related debt.

Despite the rental agreement and the "rent" payments Debtors made to Justin Vasvick or his lender, Justin Vasvick did not claim rental income on his federal income tax return for any of the years 2007 through 2016. Ex. T-8 through T-17. He claimed the mortgage interest deduction every year, however. Id.

The Trustee also highlighted evidence showing that Justin Vasvick violated his mortgage agreement by renting the Property to his parents. On May 23, 2014, Justin and Jessica Vasvick initialed a document titled "Second Home Rider," which provided:

Borrower and Lender further covenant and agree . . . :

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to Provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

9

Ex. T-7, p. 117.

When Justin Vasvick sought to refinance his debt totaling $204,000 in 2014,[12] the lender obtained an appraisal of the Property. According to First Look Appraisals, the value of the Property as of April 21, 2014, was $255,000.[13] Therefore, it appears that the Property increased $50,000 in value, and Justin Vasvick acquired $51,000 in equity, from February 2007 to April 2014. At the end of 2017, the principal balance of the debt secured by the Property totaled $186,980.92. Ex. T-18. The Court did not receive evidence of the current value of the Property.

Debtors filed for relief under Chapter 7 of the Bankruptcy Code on December 15, 2016. Doc. 1.

## III.   ANALYSIS

The Trustee seeks a determination that Debtors' transfer of the Property to Justin Vasvick as well as the ongoing transactions between Defendants related to the Property

---

[12] SUF at ¶ 9. Justin Vasvick had previously arranged to refinance $217,745 in debt secured by the Property in 2009. SUF at ¶ 8; Exs. T-6, D-106. The Trustee observed that this debt figure is $12,745 more than the principal sum of the promissory note Justin Vasvick signed in 2007. Doc. 38 at 6. The Trustee suggests that, after closing costs of approximately $1,000, Justin Vasvick should have received $11,000 of the $12,745 in equity when he sought to refinance his debt. Justin Vasvick testified that he could not recall whether he received funds during the refinance process. The Trustee offered no evidence supporting his argument that Justin Vasvick should have received $11,000.

[13] Christina Everett, a real estate appraiser with 15 years of experience in the Fargo-Moorhead market, testified at trial. She opined that the property market conditions in Fargo, North Dakota, in the last 10 years were "stable to increasing." Additionally, she testified that, in the past four years, property values (in general) increased.

10

show Justin Vasvick was unjustly enriched. He requests the Court to impose a constructive trust on the Property.[14]

The Trustee's unjust enrichment claim is governed by North Dakota law. See In re Falzerano, 454 B.R. 81, 85 (B.A.P. 8th Cir. 2011) (citing In re Wade, 219 B.R. 815, 821 (B.A.P. 8th Cir. 1998)). "Unjust enrichment is an equitable doctrine applied in the absence of a contract and used to prevent one person from being unjustly enriched at another's expense." Schroeder v. Buchholz, 2001 ND 36, ¶ 14, 622 N.W.2d 202, 206-07 (citations omitted); Lord & Stevens, Inc. v. 3D Printing, Inc., 2008 ND 189, ¶ 9, 756 N.W.2d 789, 792 (quoting Ritter, Laber and Assocs., Inc. v. Koch Oil, Inc., 2004 ND 117, ¶ 26, 680 N.W.2d 634). In other words, the "'essential element in recovering under a theory of unjust enrichment is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value.'" Schroeder, 2001 ND 36 at ¶ 14 (quoting Zuger v. North Dakota Ins. Guar. Ass'n, 494 N.W.2d 135, 138 (N.D. 1992)). Accordingly, "[e]ven when a person has received a benefit from another, that person is liable only if the circumstances of the receipt or retention are such that, as between the two persons, it is unjust to retain the benefit." Ritter, Laber

---

[14] In his Complaint, the Trustee pled a claim for constructive trust in Count I. See Doc. 1. A constructive trust is a remedy, not a cause of action. Sosne v. Fed. Dep. Ins. Corp., 2016 WL 775176, at *2 n.3 (E.D. Mo. 2016); St. Jude Med. C.S., Inc. v. Hanson, 2015 WL 2101055, at *6 (D. Minn. May 6, 2015); Secure Energy, Inc. v. Coal Synthetics, LLC, 2010 WL 1691184, at *3 (E.D. Mo. Apr. 27, 2010); Alliance Commc'ns Coop., Inc. v. Global Crossing Telcoms., Inc., 663 F.Supp.2d 807, 839–40, n.19 (D.S.D. 2009); Neher v. eBanker USA.com, Inc., 2005 WL 1006417, at *18 (W.D. Mo. Apr. 1, 2005). The Trustee's factual allegations in the Complaint and the legal allegations in Count I are sufficient to plead a cause of action for unjust enrichment with a request for a constructive trust as a remedy.

11

and Assoc., Inc., 2004 ND 117 at ¶ 26 (quoting Apache Corp. v. MDU Res. Grp., Inc., 1999 ND 247, ¶ 14, 603 N.W. 2d 891, 895).

> To prove unjust enrichment, the Trustee must establish the following elements:
>
> 1. An enrichment; 2. An impoverishment; 3. A connection between the enrichment and the impoverishment; 4. Absence of a justification for the enrichment and impoverishment; and 5. An absence of a remedy at law.

Schroeder, 2001 ND 36 at ¶15 (quoting Apache Corp., 1999 ND 247 at ¶ 13); Markgraf v. Welker, 2015 ND 303, ¶ 23, 873 N.W.2d 26, 34.

The Trustee claims Justin Vasvick received the transfer of the home and the benefit of all the payments, taxes, insurance, maintenance and repairs Debtors paid. He also maintains that Justin Vasvick received additional benefits from this arrangement by neglecting to report rental income on his tax return and acquiring equity in the home due to debt payment and the increase in the value of the Property between May 2007 and the date of trial. He argues that Defendants' rental agreements—both oral and written—were a "shell game" designed to protect their home from creditors. Doc. 38 at 14.

Beginning with the transfer of the Property from Debtors to Justin Vasvick in 2007, the Trustee points to a lack of evidence regarding the disposition of $11,000 in equity and speculates that Justin Vasvick used these funds to pay "closing costs and monthly mortgage payments." Doc. 38 at 6; see also Doc. 39 at 3 n.2. The evidence shows Debtors conveyed the Property to Justin Vasvick via warranty deed on April 30, 2007. SUF ¶ 4, 5. On the same day, Justin Vasvick executed a note promising to repay Homecoming Financial, LLC the sum of $205,000, the appraised value of the Property. To secure the note, Justin Vasvick granted Homecoming Financial, LLC a mortgage against the Property. Justin Vasvick paid $210,105.82 for the Property,

12

including $5,105.82 in settlement charges. Debtors used the proceeds they received to satisfy the existing balance of their mortgage on the Property, which totaled approximately $194,000 at the time of transfer. The parties provided no documentary evidence of the disposition of the $11,000 of equity in the Property at the time of the transfer, but Darrell Vasvick and Justin Vasvick testified that the $11,000 benefited Debtors either through the payment of sale costs or profit to Debtors. The Court finds this testimony more credible than the Trustee's speculation that Justin Vasvick received the funds.

Applying the first two elements of the unjust enrichment claim, the Court finds that Justin Vasvick was both enriched by acquiring legal title to the Property and equally impoverished by incurring the legal obligation to pay the promissory note he signed. At the same time, Debtors were impoverished by the initial transfer because they transferred legal ownership to the Property and were equally enriched by satisfaction of their outstanding mortgage balance and receipt of the fair market value of the Property. The Trustee did not meet his burden of showing that Justin Vasvick was enriched or that Debtors were impoverished by the transfer of the Property in April 2007.

The Trustee also argues that the transactions between Justin Vasvick and Debtors between May 2007 and May 2018 show Justin Vasvick was unjustly enriched. Specifically, the Trustee asserts that, beginning in May 2007, Debtors made all payments related to the Property and incurred "all incidences and burdens of ownership while retaining none of the benefit." Doc. 38 at 15. Justin Vasvick, on the other hand, acquired equity in a home "for which he has contributed nothing to improve the value."

13

Doc. 38 at 14. Accordingly, the Trustee argues Debtors were impoverished and Justin Vasvick was enriched by the transactions related to the Property.

The evidence shows that Debtors made numerous payments related to the Property, including the promissory note installment payments together with real estate taxes, mortgage insurance and homeowner's insurance (which the Defendants characterize as rent), some real estate taxes and insurance (in addition to those included in the "rent" payments), regular maintenance and major repairs and renovations to the Property including new carpet and repairs to the roof and deck. While Debtors spent money on these items, this financial loss does not necessarily translate to impoverishment as the Trustee suggests. The Trustee's argument ignores the fundamental benefit Debtors received under the agreement—a place to live. According to the evidence at trial, $1,500 per month is a fair rental value of the Property.[15] Therefore, the benefit of residing in the Property from May 2007 to May 2018 (130 months) is worth $195,000. If the Court reduces Debtors' benefit to reflect the "rent" to which Defendants agreed—$1,500 from May 2007 to October 2013 and $1,300 from November 2013 to May 2018—the benefit of residing in the Property totals $188,500.

The evidence shows that Debtors paid $200,746 for the benefit of living at the Property (including the cost of renovations and carpet replacement). The difference between either $195,000 or $188,500 and $200,746 ($5,746 or $12,246) is not the receipt of a benefit by Justin Vasvick from Debtors that would be inequitable to retain

---

[15] The Trustee quibbles with Defendants' evidence regarding fair rental value, but he offered no evidence contradicting Darrell Vasvick's testimony that $1,500 per month was a fair charge for renting the Property in 2007 or any subsequent year.

14

without paying for its value.  See Schroeder, 2001 ND 36 at ¶ 14.  In other words, this disparity is not unjust enrichment justifying the imposition of a constructive trust against the Property in its entirety.[16]

The Trustee argues that Justin Vasvick realized other benefits that must be factored into the unjust enrichment analysis.  For example, the Trustee maintains Justin Vasvick "should have received" $11,000 in equity when he sought a debt refinance in 2009, and Justin Vasvick held $50,000 in equity when he received a debt refinance in 2014.  Doc. 38.  He argues that these sums should be added to the enrichment calculation.

There are several flaws in the Trustee's argument that the $50,000 increase in the Property's market value (or Justin Vasvick's equity) between 2007 and 2014 is an impoverishment to Debtors.  First, the Court received no evidence regarding the value of the property or the total debt against it as of May 2018.  Consequently, Justin Vasvick's equity in the Property at the time of trial could be more or less than $50,000.  Since enrichment and impoverishment are determined as of the time of trial, the Trustee's evidence is incomplete.

---

[16] A survey of North Dakota Supreme Court cases reveals that North Dakota courts typically award an equitable remedy to a plaintiff on an unjust enrichment claim involving real estate only when the defendant's enrichment and plaintiff's impoverishment is significant.  See e.g., Paulson v. Meinke, 389 N.W.2d 798, 801-02 (N.D. 1986) (finding that a transfer of land for less than one-third the land's value, an "apparent windfall of nearly $60,000," was clearly unjust enrichment); Wildfang-Miller Motors, Inc. v. Miller, 186 N.W.2d 581, 586 (N.D. 1971) (finding enrichment and impoverishment where land was acquired for approximately 60-77% of market value); Schroeder v. Buchholz, 2001 ND 36, ¶¶ 16-19, 622 N.W.2d 202 (finding unjust enrichment would result from party's attempt to evict second party from land, where second party paid half the purchase price of the land, built a home on the land and jointly improved the land with the first party, but did not hold title).

15

More importantly, the increase in the value of the Property is not a "benefit at the direct expense of" Debtors. <u>See</u> <u>Apache Corp.</u>,1999 ND 247 at ¶ 15 (citation omitted) (finding that plaintiff's loss "resulted from its use of a percentage of proceeds as a pricing factor in its agreements," not as a result of defendant's conduct). It is undisputed that Debtors owed more than $500,000 to the SBA in 2007. Darrell Vasvick testified that he was unemployed for months after 3-D Printing closed, and Debtors could not afford to make their mortgage payments. They sold their home to Justin Vasvick. With the transfer of the home, Debtors relinquished the opportunity to earn equity in the Property. For several months after the sale, Debtors did not pay $1,500 "rent" or even the sum of Justin Vasvick's installment payment because they could not afford to pay more than $500. The evidence shows that Justin Vasvick made (or ensured that Debtors paid) the installment payments on the promissory note secured by the Property, real estate taxes and insurance from May 2007 to May 2018. The evidence also shows that property values in Fargo generally increased in the last 10 years. Justin Vasvick benefited from this general increase in property values and the reduction in his debt against the home, but this benefit was not at the expense of Debtors. Debtors' sale of the Property to Justin Vasvick benefited both parties by allowing Debtors to live in a home they could not afford and by transferring property to Justin Vasvick that increased in value from 2007 to 2014.[17] Consequently, the Court is not convinced that Justin Vasvick received the benefit of equity in the Property that would be inequitable to retain.

---

[17] Defendants' arrangement also burdened both Debtors and Justin Vasvick–Debtors paid "rent" and Justin Vasvick assumed the legal and personal responsibility to pay the debt secured by the Property, real estate taxes and homeowners insurance.

16

The Trustee also maintains that Justin Vasvick "should have received" $11,000 in equity when he sought a debt refinance in 2009. The Trustee offered no evidence that Justin Vasvick withdrew or received $11,000 in equity in 2009. He surmises that Justin Vasvick held equity in the Property based on the fact that the principle balance of his loan totaled $205,000 in 2007, and the sum of the refinanced note in 2009 totaled $217,745. He then speculates that, after closing costs of approximately $1,000, Justin Vasvick "should have received" $11,000 during the 2009 refinance process. Doc. 38 at 6. The Trustee offered no evidence in support of this theory. Justin Vasvick testified that he could not recall whether he received funds during the refinance process. The Trustee's speculation, without more, is not sufficient to influence the unjust enrichment analysis. Even if the Trustee had offered evidence that Justin Vasvick withdrew $11,000 in equity in 2009, the Court is not convinced that this benefit to Justin Vasvick impoverished Debtors. For the reasons stated above, Justin Vasvick did not receive the benefit of equity in the Property at Debtors' expense.

Likewise, the Court rejects the Trustee's suggestion that it must consider Justin Vasvick's failure to declare rental income on his federal income tax return as enrichment justifying the imposition of a constructive trust. While Justin Vasvick may have inappropriately benefited from neglecting to report rental income on his tax return, it was not a "benefit at the direct expense of" Debtors. See Apache Corp., 1999 ND 247 at ¶ 15.

Similarly, Justin Vasvick did not benefit at the direct expense of Debtors when he ignored the clause in the mortgage agreement he signed, prohibiting him from renting the Property. The Trustee argues Debtors' "rent" payments from May 2014 to the

17

present should be subtracted from the overall benefit because Justin Vasvick was in breach of the Second Home Rider to the 2014 mortgage refinance. Doc. 39 at 6. The Trustee claims that because Justin Vasvick signed the Second Home Rider, indicating the Property was a second home and not a rental property, he should not be able to benefit from this "fraud against the mortgage company." Doc. 39 at 7. The Trustee argues: "If the Debtors lived in the home after the 2014 refinance, they should have been doing so rent free." Doc. 39 at 7. If Justin Vasvick benefitted by ignoring this agreement, it was to the detriment of his mortgage lender, not Debtors. There is no connection between Justin Vasvick's alleged enrichment arising from his decision to ignore the Second Home Rider and Debtors' impoverishment. See Schroeder, 2001 ND 36 at ¶15. The Trustee failed to meet this element of his unjust enrichment claim.

To be clear, the Court does not condone Defendants' conduct. Defendants' cumbersome and complicated efforts to make it appear as though Justin Vasvick made payments to his mortgage lender or to conceal the fact that Debtors made these payments raise suspicion. Likewise, Justin Vasvick's failure to report rental income and his failure to comply with the terms of his 2014 mortgage by allowing his parents to lease the Property give the Court pause. But the Court is not required to judge Defendants' credibility or intentions in the abstract. Rather, it must decide if the evidence shows whether Justin Vasvick was enriched at Debtor's expense. The Trustee did not meet this burden of proof.

The Court considered all the Trustee's other arguments and finds that they do not justify the imposition of a constructive trust on the Property.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Trustee's causes of action under Counts I, III and IV of the Trustee's Complaint are dismissed with prejudice. The Clerk shall schedule a status conference to discuss scheduling a trial on Count II.

Dated: November 1, 2018.

*/s/ Shon Hastings*

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT