## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 16-30652

Darrell H. Vasvick,
f/d/b/a 3D Printing, Inc.,
and Susan M. Vasvick,                                     Chapter 7

              Debtors.
_____/

Kip M. Kaler, as Bankruptcy Trustee,

              Plaintiff,

       v.                                                 Adversary No. 17-07017

Darrell H. Vasvick, Susan M. Vasvick
and Justin Vasvick,

              Defendants.
_____/

## MEMORANDUM AND ORDER

## I.    INTRODUCTION

Bankruptcy Trustee Kip M. Kaler filed a Complaint alleging Debtors/Defendants Darrell H. and Susan M. Vasvick's transfer of real property located at 1509 17th Street South, Fargo ("the Property")[1] to their son, Defendant Justin Vasvick, resulted in unjust enrichment warranting the imposition of a constructive trust on the Property (Count I).  Doc. 1.  The Trustee also sought a declaratory judgment: (1) ruling that Debtors, who have resided in the Property since the 1980s, retained an equitable interest in the Property despite transferring the legal interest to their son, and (2) finding that the Property is property of the bankruptcy estate (Count III). Additionally, the Trustee sought turnover of the Property (Count IV).  In the alternative, the

_____

[1] The legal description of the Property is:  Lot 3, Block 3, replat of Harold A. Johnson's First Addition to the City of Fargo, Cass County, North Dakota.

Trustee alleged that Debtors "performed or caused to be performed $24,041.96 worth of improvements to the Property" he claims are avoidable as fraudulent transfers under 11 U.S.C. § 548 (Count II).  He also claims that "all other improvements or expenses paid by the Debtors for improvement or maintenance of the Property, beyond the terms of a fair market lease of the Property, were also transfers that the bankruptcy estate should recover from Justin Vasvick." (Count II).  Defendants filed an Answer, claiming the Trustee failed to state a cause of action for which relief may be granted.  Defendants alleged other defenses as well.

At the request of the parties, the Court bifurcated the Trustee's causes of action. Specifically, it continued trial on the fraudulent transfer claim, and the parties tried Counts I, III and IV to the Court on May 15 and 16, 2018.  The Court found in favor of Defendants and dismissed Counts I, III and IV of the Complaint.

On January 24, 2019, Defendants filed a Motion for Summary Judgment, arguing that they were entitled to judgment as a matter of law based on the Court's findings and conclusions following trial of Counts I, III and IV of the Complaint.  Doc. 48.  In reviewing the motion, related pleadings and factual findings in the Court's Memorandum and Order filed November 1, 2018, the Court found that the Trustee alleged a cause of action for fraudulent transfer under both section 548(a)(1)(A) for fraud and section 548(a)(1)(B) for constructive fraud.  The Court granted Defendants' motion for summary judgment on the Trustee's section 548(a)(1)(B) claim, and it denied the motion on the Trustee's section 548(a)(1)(A) claim.

The Court tried the Trustee's section 548(a)(1)(A) claim on May 15, 2019.  At trial, the parties stipulated that the Court may receive all the exhibits offered and received during the May 15-16, 2018, trial.  The Court received no additional exhibits at the May 2019 trial.  The parties also stipulated that the Court may consider all the testimony heard at the May 2018 trial.  Only one witness, Darrell Vasvick, testified at the May 15, 2019, trial.  After considering

the evidence received at both trials, the Court finds in favor of the Trustee and against Defendants on the Trustee's section 548(a)(1)(A) cause of action.

## II.    BACKGROUND

Debtors purchased the Property in 1976 and have lived there ever since.  In 2005, Debtors refinanced the debt secured by the Property and granted a mortgage to Popular Finance Services in the sum of $186,400.  Ex. T-4.  Wynn Appraisals, Inc. performed an appraisal at the time of refinance and estimated that the value of the Property was $233,000 in June 2005.  Ex. T-1.  Based on the appraisal, Debtors held $46,600 in equity in the Property in 2005.

In 2006, Debtors began experiencing financial difficulties associated with 3-D Printing, a business they owned.  In 2006 or early 2007, the business ceased operations.  Darrell Vasvick and two other individuals owed over $500,000 to the Small Business Administration at that time.  After 3-D Printing closed, Darrell Vasvick was unemployed for eight months.

At about the same time, Debtors determined they could not afford to stay current on their monthly mortgage payments on the Property.  They began talking about moving their residence to a Minnesota lake home on Big Cormorant Lake they owned with Susan Vasvick's brother and his wife, Steve and Pam Zinniel.[2]  Defendants claim Justin Vasvick overheard Debtors' conversation about moving to the lake home and approached them about purchasing the Property.

_____

[2] Darrell Vasvick testified that Debtors moved to the lake home in 2007 and changed their permanent residence to Minnesota for tax purposes.  According to Debtors, they lived at the lake home for only a short period of time.  Due to the cost of gasoline and the amount of time they spent commuting to work, Debtors moved back to the Property shortly after Justin Vasvick purchased it.  Debtors hoped to maintain their ownership of the lake property, but eventually they sold their share of the lake home to the Zinniels in 2012.

The Trustee characterized the exchange between Darrell, Susan and Justin Vasvick differently.  The Trustee argued that Debtors and Justin Vasvick entered into an agreement providing that Justin Vasvick would purchase the Property from Debtors to protect the asset from creditors.  Doc. 38 at 2, 8-9.  To support this argument, he offered testimony from the Zinniels.  Although uncertain about specific details, Pam Zinniel testified that "sometime in 2007 or 2008" Darrell Vasvick told her he put the house "in Justin's name" because he was having financial difficulty and, if he ever had to file bankruptcy, the house would be secure.  Steven Zinniel testified that he recalled the conversation and reiterated Pam Zinniel's account.

On April 30, 2007, Debtors conveyed the Property to Justin Vasvick via warranty deed. SUF ¶ 4, 5.  On the same day, Justin Vasvick executed a note promising to repay Homecoming Financial, LLC the sum of $205,000, the appraised value of the Property.[3]  To secure the note, Justin Vasvick granted Homecoming Financial, LLC a mortgage against the Property.  Justin Vasvick paid $210,105.82 for the Property, including $5,105.82 in settlement charges.  SUF ¶ 4.  Debtors used the proceeds they received to satisfy the existing balance of their mortgage on the Property, which totaled approximately $194,000 at the time of transfer.[4]  SUF ¶ 6.  The Cass County Recorder recorded a "Satisfaction of Mortgage" on May 25, 2007.  Ex. T-5.

Despite selling the Property to Justin Vasvick, Debtors continued to live at the Property.[5] According to Defendants, Debtors and Justin Vasvick negotiated an oral rental agreement. Under the terms of the purported agreement, Debtors would "try to pay" Justin Vasvick $1,500

---

[3] Carter G. Wynne with Wynn Appraisals estimated that the value of the Property was $205,000.  The effective date of the appraisal was February 20, 2007.  Ex. T-2.

[4] The parties offered no evidence of the disposition of the $11,000 of equity in the Property at the time of the transfer, but Darrell Vasvick and Justin Vasvick testified that the full value inured to the benefit of Debtors either through the payment of sale costs or profit to Debtors.

[5] Justin Vasvick also resided at the Property until 2014.

4

per month for "rent" because this sum was close to the sum of Justin Vasvick's mortgage payment plus taxes, mortgage insurance and homeowner's insurance.  Defendants also considered $1,500 to be "fair rental value" based on advertisements of homes and apartments for rent in the Forum of Fargo-Moorhead, the local newspaper.

Debtors made it clear to Justin Vasvick that they probably would not be able to pay the full $1,500 per month at the beginning of Defendants' agreement because of their difficult financial condition.  If Debtors were unable to make the full payment in any month, Justin Vasvick accepted the sum Debtors could afford with the understanding that Debtors would pay the remaining balance sometime in the future.

During the May 2018 trial, the evidence showed that Defendants did not keep a contemporaneous written accounting of Debtors' arrearages.[6]  Contrary to this evidence, Darrell Vasvick testified in May 2019 that he kept a record of the debt Debtors' owed to Justin Vasvick.  He did not disclose this written tally to the Trustee during discovery because "no one asked [him for it]."

According to Defendants, their oral agreement continued until November 2013 when Debtors entered into a written lease agreement with Justin Vasvick and his wife, Jessica Vasvick.  Ex. T-20.  The written lease suggests that Defendants entered into a month-to-month periodic tenancy requiring Debtors to pay rent of $1,300 per month.

---

[6] In preparation for May 2018 trial, Defendants reportedly reviewed check blanks and bank statements to calculate the arrearage Debtors owed to Justin Vasvick.  Defendants claim that Debtors were in arrears to Justin Vasvick from 2007 through 2014.  They also claim that, by May 2018, Debtors paid the arrearage and were entitled to a credit on rent in the sum of $2,566.  Ex. T-23.

The parties offered extensive records and testimony regarding the history of "rent" and promissory note payments on the debt secured by the Property.[7]  As explained in more detail below, Debtors never paid Justin Vasvick the exact amount owed under the terms of either the oral rental agreement or the written lease until October 2016, less than two months before they petitioned for bankruptcy relief.  Instead, Debtors typically paid the exact amount due under the promissory note secured by the Property or the promissory note payment plus taxes and insurance.  See Exs. T-23, T-26.

From May to December 2007 (with the exception of August), Debtors paid Justin Vasvick $500 per month because they could not afford to pay the entire mortgage payment or the $1,500 per month "rent" payment.  Exs. T-23, T-25.  In 2008, Debtors paid Justin Vasvick $1,604.00 in January, $1,626.26 in April and $1,628.32 in October and November.  Exs. T-23, T-25.  Debtors paid Justin Vasvick's lender $1,628.32 in December 2008.  In 2009 and 2010, Debtors made payments to Justin Vasvick most months,[8] writing checks in sums ranging from $1,578.49 to $1,692.67 per month.  Ex. T-23.  At the May 2018 trial, Darrell Vasvick testified these sums were equivalent to the mortgage payment each month which included principal, interest and insurance.

Beginning in 2011, the bank statements show a general pattern in which Darrell Vasvick transferred funds by writing a check from Debtors' checking account to the joint checking account he held with Justin Vasvick at State Bank & Trust (the "Joint Account").  Exs. T-27, T-

---

[7] The Court received check register data for some of the months between 2007 and 2010, bank statements from 2011 to the present and certain credit card statements.  See Exs. T-25, 26, 28, 29, 30.

[8] There is no evidence that Debtors made payments to Justin Vasvick in August or November 2009, but Debtors made two payments in October 2009.  In March 2009, Darrell Vasvick paid Justin Vasvick's lender directly.  In 2010, Debtors made a payment to Justin Vasvick for every month except March.  Exs. T-23, T-25.

26.  Darrell Vasvick then paid Justin Vasvick's mortgage lender from the Joint Account.[9]  Ex. T-27.  Defendants maintained this arrangement until May 2013, when Darrell Vasvick began paying the lender directly by writing checks from Debtors' checking account or electronically transferring funds from Debtors' checking account to the lender.  Ex. T-23.  Darrell Vasvick continued this practice until September 2016,[10] when Justin and Jessica Vasvick decided to stop using the Joint Account for "rent" and promissory note payments.  See Ex. T-23.  Instead, Justin and Jessica Vasvick began using the Joint Account for savings and emergency purposes only.

In May 2014, Justin Vasvick sought to refinance the debt secured by the Property ($204,000 at the time) with a new lender.  Under the terms of the new promissory note, Justin Vasvick's lender charged a lower interest rate and eliminated charges for private mortgage insurance, resulting in a lower monthly payment of $1,119.47.  After Justin Vasvick refinanced the debt, Darrell Vasvick began paying the new lender $1,119.47 per month, the exact amount of the note payment rather than paying Justin Vasvick the $1,300 per month required by the written lease.  Exs. T-26, T-23.

---

[9] Both Darrell and Justin Vasvick were signors on the Joint Account, but Justin Vasvick made the payments to the lender only three times from January 2011 to April 2013: March 2011, April 2011 and April 2012.  Ex. T-27.  Darrell Vasvick made the payments from the Joint Account for the remaining months. Ex. T-27.

[10] From June 2014 to September 2016, Debtors paid the exact amount of the promissory note payment (roughly $1,120 per month), which was less than required under the written lease.  Debtors paid the exact sum of the mortgage payment even though they were behind on their purported promise to Justin Vasvick to pay arrearages.  Ex. D-113.  Consequently, Debtors' alleged arrearages to Justin Vasvick grew during this period.  During the May 2019 trial, Darrell Vasvick explained that he attempted to "make up" the difference between the mortgage payment and the rent payment (approximately $180 per month) by paying homeowner's insurance that he was not obligated to pay under the lease.  Despite these efforts to make up the difference, Darrell Vasvick testified that Debtors owed Justin Vasvick $18,000 to $20,000 in "back rent" by the end of 2015.

In October 2016, Justin Vasvick and Darrell Vasvick opened a new joint account at Gate City Bank.  Ex. T-30.  From October 2016 to May 2018, Darrell Vasvick transferred $1,300 each month from Debtors' checking account to the new joint account at Gate City Bank.  In November 2016, either Darrell Vasvick or Justin Vasvick made arrangements for monthly automatic electronic payments from the new joint account to Justin Vasvick's lender.  Ex. T-30. The monthly automatic electronic payment continued until May 2018.  The parties did not offer any evidence regarding "rent" or mortgage payments after May 2018.

From May 2007 (the month after Debtors sold the Property to Justin Vasvick) to May 2018, Debtors paid a total of $164,035.83 to Justin Vasvick or on his behalf for "rent."  In addition to these payments, Debtors occasionally paid real estate taxes and homeowner's insurance directly, even though the "rent" payment supposedly included these expenses.[11] Debtors also typically paid expenses necessary to maintain the Property, and they incurred significant expenses on major repairs and renovations that are the subject of the Trustee's

_____

[11] Justin Vasvick reimbursed Debtors for some of these expenses.  For example, Debtors paid $2,844.51 in real estate taxes on December 31, 2014 (check #4466, cleared on January 1, 2015).  Ex. D-127.  Debtors also paid $3,030.70 in real estate taxes on December 30, 2015 (check #4382, cleared on January 3, 2016).  Ex. D-129.  On May 12, 2015, Justin Vasvick deposited $3,712.00 into Debtors' checking account.  Ex. T-26 at 362.  On July 13, 2015, Justin Vasvick paid $300 to Debtors and, on April 26, 2016, he paid $1,600 to Debtors. Ex. T-26 at 375, 429.

At the May 2019 trial, Darrell Vasvick testified that Justin Vasvick reimbursed him for taxes when Debtors owed Justin Vasvick $18,000 to $20,000 in "back rent" because Defendants had a separate understanding related to payment of taxes and payment of rent. Darrell Vasvick testified that Defendants agreed that Debtors would pay the taxes when due, and Justin Vasvick would pay them back to "get caught up."  Justin Vasvick's only explanation for reimbursing Debtors for taxes rather than crediting them toward arrearages is that he "did not think to do that."

In addition to real estate tax payments, Justin Vasvick reimbursed Debtors $2,500 on July 2, 2012, for home improvement expenses, including a TV, grill and fence.  T-28, 601. From 2011-2013, Justin Vasvick also reimbursed Debtors for his monthly cell phone bill and occasionally for food and other miscellaneous expenses.

fraudulent transfer claims. In 2015, Debtors paid Rokke Construction a total of $23,302.96 for repairs to the deck and roof.[12] Exs. T-22, T-28 p. 591. In January and February 2016, Debtors spent $9,686 on carpet, materials and installation to replace carpet their dog ruined. Exs. T-28 at 606. In summary, Debtors spent a total of $200,746 related to the Property from May 2007 to May 2018, itemized as follows:

- $164,035.83 "rent"/mortgage payments

- $263.21 real estate taxes (See n.13)

- $3,464.00 homeowner's insurance (2015 and 2016)

- $23,302.96 repairs and renovations

- $9,686 carpet replacement and installation

While the parties offered extensive records of the payments Debtors made related to the Property, the record does not include documentation of all of Justin Vasvick's payments. For example, the Court received written documentation substantiating only six payments Justin Vasvick made to the mortgage company for the years 2007 through 2010. Ex. T-23; Ex. T-25 pp. 200, 201, 203, 205. Justin Vasvick testified that all the payments were made during those years, however. Additionally, trial exhibits and summaries show that either Darrell Vasvick or Justin Vasvick made the large majority of these payments. See Exs. T-10; D-142, D-143.

---

[12] During the May 2019 trial, Darrell Vasvick testified that Debtors knew they were not obligated by the written lease to pay for the deck and roof repairs, but he claimed Debtors paid these expenses in an effort to pay the $18,000 to $20,000 in "rent" arrearages they owed Justin Vasvick. He claimed Debtors offered to pay for the repairs from Darrell Vasvick's inheritance. Darrell Vasvick testified that after spending some of the money he inherited on maintenance and roof repair expenses, Debtors satisfied the remaining arrearages to Justin Vasvick and earned several thousand dollars of credit. Darrell Vasvick testified that even though the cost of roof repair may have been in excess of arrearages to Justin Vasvick, Darrell Vasvick promised to pay the roof repair expense and so he paid it.

Justin Vasvick still owns the Property, and there is no evidence Justin Vasvick missed a payment or otherwise defaulted on his mortgage-related debt.

Despite the rental agreement and the "rent" payments Debtors made to Justin Vasvick or his lender, Justin Vasvick did not claim rental income on his federal income tax return for any of the years 2007 through 2016. Ex. T-8 through T-17. He claimed the mortgage interest deduction every year, however. Id.

The Trustee also highlighted evidence showing that Justin Vasvick violated his mortgage agreement by purportedly renting the Property to his parents. On May 23, 2014, Justin and Jessica Vasvick initialed a document titled "Second Home Rider," which provided:

Borrower and Lender further covenant and agree . . . :

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to Provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

Ex. T-7, p. 117.

When Justin Vasvick sought to refinance his debt totaling $204,000 in 2014,[13] the lender obtained an appraisal of the Property. According to First Look Appraisals, the value of the

---

[13] SUF at ¶ 9. Justin Vasvick had previously arranged to refinance $217,745 in debt secured by the Property in 2009. SUF at ¶ 8; Exs. T-6, D-106. The Trustee observed that this debt figure is $12,745 more than the principal sum of the promissory note Justin Vasvick signed in 2007. Doc. 38 at 6. The Trustee suggests that, after closing costs of approximately $1,000, Justin Vasvick should have received $11,000 of the $12,745 in equity when he sought to refinance his debt. Justin Vasvick testified that he could not recall whether he received funds

Property as of April 21, 2014, was $255,000.[14]    Therefore, it appears that the Property increased $50,000 in value, and Justin Vasvick acquired $51,000 in equity, from February 2007 to April 2014.  At the end of 2017, the principal balance of the debt secured by the Property totaled $186,980.92.  Ex. T-18.  The Court did not receive evidence of the current value of the Property.

During the May 2019 trial, the parties devoted considerable time to income Debtors received and debts they paid in 2015 and 2016.  In January 2015, Debtors received a $27,950 wire transfer.  Ex. T-26, 337.  Darrell Vasvick could not recall the source of the funds.  On August 17, 2015, Darrell Vasvick received a $79,000 inheritance from his father's estate.  See Ex. T-28, 587.  Darrell Vasvick estimated that Debtors owed approximately $1,000,000 to creditors at the time of his inheritance.  This included a debt of more than $800,000 to the Small Business Administration ("SBA").

By the time Debtors paid for the deck, roof repair and carpet in late 2015 and early 2016, no creditors were pursuing Debtors for payment.  Darrell Vasvick testified that he had not heard from the SBA since 2011 or 2012.  He also claimed he did not face any threat of a lawsuit from the SBA or other creditors.  In fact, Darrell Vasvick claims a banker at Vision Bank, where Debtors originated their SBA loan, told him in 2011 or 2012 that "usually the SBA does not go after [borrowers who default]" and the SBA "writes off" bad loans.  Consequently, Darrell Vasvick maintained that he "never thought SBA would come after us" for the loan default dating

_____

during the refinance process.  The Trustee offered no evidence supporting his argument that Justin Vasvick should have received $11,000.

[14] Christina Everett, a real estate appraiser with 15 years of experience in the Fargo-Moorhead market, testified at trial.  She opined that the property market conditions in Fargo, North Dakota, in the last 10 years were "stable to increasing."  Additionally, she testified that, in the past four years, property values generally increased.

back to 2006 or 2007.  It appears that Debtors made no payments to SBA after they defaulted on the loan.[15]

Darrell Vasvick also testified that Debtors consistently made minimum installment payments on their credit card debts, and they were current on their bills at the time of his inheritance.  He claims that after paying for the home improvements and clearing the arrearage to Justin Vasvick, he used his remaining inheritance to pay down Debtors' significant credit card debts, including a $13,000 payment to Discover.  He testified that he never intended to file bankruptcy; it was not until the SBA started garnishing his wages and he lost his job in December 2016 that he began to seriously consider bankruptcy.

Debtors filed for relief under Chapter 7 of the Bankruptcy Code on December 15, 2016. Doc. 1, Bankr. Case. No. 16-30652.

## III.    ANALYSIS

Bankruptcy Code section 548(a)(1) provides:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

---

[15] Debtors did not testify that they made any payments to SBA after their default in 2006 or 2007 or otherwise highlight such payments in the voluminous exhibits the Court received.

11 U.S.C. § 548(a)(1).  To avoid transfers under section 548, the Trustee must show either that the transfer was made with actual fraudulent intent or that the transfer was constructively fraudulent.  <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 535 (1994).  Under both actual and constructive fraud theories, the party alleging the fraud bears the burden of proof by a preponderance of the evidence.  <u>Luker v. Eubanks</u> (<u>In re Eubanks</u>), 444 B.R. 415, 422 (Bankr. E.D. Ark. 2010) (citations omitted); <u>see also</u> <u>Kaler v. Craig</u> (<u>In re Craig</u>), 144 F.3d 587, 590 (8th Cir. 1998).

To succeed on his section 548(a)(1)(A) fraudulent transfer claim, the Trustee must show: (1) the debtor had an interest in property, (2) the debtor voluntarily or involuntarily transferred that interest, (3) the transfer occurred on or within two years before the debtor filed for bankruptcy relief, and (4) the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor on or after the date of the transfer.  11 U.S.C. § 548(a)(1); <u>see also</u> <u>Kaler v. McLaren</u> (<u>In re McLaren</u>), 236 B.R. 882, 898 (Bankr. D.N.D. 1999); <u>Allred v. Hauser</u> (<u>In re Jundt</u>), 2014 WL 2742868, at *6 (Bankr. D.S.D. June 17, 2014).  Actual harm to creditors is not an element of this claim.  <u>Brown v. Third Nat'l Bank</u> (<u>In re Sherman</u>), 67 F.3d 1348, 1355 n.6 (8th Cir. 1995) (citation omitted).[16]

---

[16] <u>See also</u> <u>Tavenner v. Smoot</u>, 257 F.3d 401, 407–08 (4th Cir. 2001) ("Section 548 properly focuses on the intent of the debtor, for if a debtor enters into a transaction with the express purpose of defrauding his creditors, his behavior should not be excused simply because, despite the debtor's best efforts, the transaction failed to harm any creditor." (citations omitted)); <u>Wessinger v. Spirey</u> (<u>In re Galbreath</u>), 2003 WL 26119288, at *11–12 (Bankr. S.D. Ga. Aug. 27, 2003) ("Lack of equivalent value is not an essential element for avoidance on the basis of actual fraudulent intent. While it is a factor to be considered in making a determination regarding actual fraudulent intent, the plain language of § 548(a)(1)(A) does not expressly condition avoidability of a transfer or transaction on a finding of actual harm to the estate but only upon a debtor's proven intention to hinder, delay or defraud creditors." (citations omitted)).

13

The parties agree and the Court finds that the Trustee met his burden of establishing the first three elements of his claim.  Consequently, he need only show that Debtors transferred an interest in property with actual intent to hinder, delay or defraud any of their creditors.

Because direct evidence of actual intent to hinder, delay or defraud creditors is rare, courts may infer fraudulent intent from the circumstances surrounding the transfer.  Richie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 861 (8th Cir. 2015) (quoting In re Sherman, 67 F.3d at 1353).  The Eighth Circuit Court of Appeals considers factors or "badges of fraud" to determine whether a debtor transferred assets with actual intent to hinder, delay or defraud creditors.  Id.  The badges of fraud include:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008) (citation omitted); see also Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998).  The badges of fraud are a nonexhaustive list of "circumstantial factors" that a court may use to infer fraudulent intent, and courts are "free to consider any other factors bearing upon the issue of fraudulent intent." Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62 (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009–10 (8th Cir. 2000)).

The presence of a single badge is typically not sufficient to establish actual fraudulent intent.  In re Sherman, 67 F.3d at 1354.  The confluence of several badges, however, creates a presumption of fraudulent intent.  Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62; Kelly, 141 F.3d at 802.  Once the trustee offers evidence sufficient to create a presumption of fraudulent intent, "'the burden shifts to the transferee to prove some legitimate supervening purpose for

14

the transfers at issue.'" Ritchie Capital Mgmt., LLC, 779 F.3d at 861–62 (quoting Kelly,141 F.3d at 802).   Absent significantly clear evidence of a legitimate supervening purpose, the confluence of several badges of fraud can conclusively establish actual fraudulent intent.   In re Sherman, 67 F.3d at 1354 (citation omitted).

As explained in the Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment [Doc. 60], the Court considers Justin Vasvick's status as a subsequent transferee/transfer beneficiary when weighing direct evidence of fraudulent intent and when analyzing the badges of fraud and any other relevant factor to determine whether there is circumstantial evidence of fraudulent intent.

During the May 2018 trial, the Trustee offered direct evidence of Debtors' intent to protect the Property from creditors through the testimony of Pam and Steven Zinniel.  The Zinniels testified that Darrell Vasvick conceded that he "put the house in Justin's name" because he was having financial difficulty and wanted to make sure the house was "secure" if he ever petitioned for bankruptcy relief.   The Trustee also offered evidence establishing Debtors' scheme to protect this asset began in 2007 and continued through trial.  While Debtors transferred the Property to their son through legal instruments, it is apparent that (1) they viewed the Property as their own, and (2) their tenant/landlord relationship was fictitious. Evidence supporting this conclusion includes:

1. Debtors transferred the Property to their son who was living with them at the time and resided in the Property with them until 2014.

2. At the time of the transfer of the Property in 2007, Debtors owed significant debt to the SBA.  By the time Debtors paid for the roof and deck repair in 2015 and replaced the carpet in 2016, they owed creditors approximately $1,000,000, roughly $800,000 of this debt to the SBA.

3. Debtors resided in the Property from the 1980s to the time of trial, retaining possession and use of the property throughout this time, even though they claim they moved to a lake home for a short time.

4. Debtors paid the vast majority of mortgage, taxes, mortgage insurance and homeowners insurance payments for the Property but took extraordinary steps to make it appear as though Justin Vasvick made these payments. Some years they paid Justin Vasvick the exact sum of the mortgage payment and Justin Vasvick paid the mortgage lender. Some years Debtors deposited the mortgage payment in a joint account held by Justin Vasvick and Darrell Vasvick and then Darrell Vasvick made the mortgage payment from this joint account. It appears that Darrell Vasvick occasionally tired of this arrangement and made Justin Vasvick's mortgage payments directly from Debtors' account. Defendants offered no explanation for these odd arrangements, leaving the Court to conclude that Defendants were trying to make it appear as though Justin Vasvick made the payments toward the debt secured by the Property.

5. Defendants claim they entered into lease agreements with Justin Vasvick, but they essentially ignored these agreements. Until roughly two months before they petitioned for bankruptcy relief, Debtors paid the sum of the mortgage payment or mortgage/taxes/insurance payment rather than the "rent" to which the parties reportedly agreed. With rare exceptions like a grill and a fence, Debtors paid for home repair and maintenance expenses. Debtors occasionally paid real estate taxes and homeowner's insurance directly, even though the "rent" payment (at least until 2013 and probably thereafter) included these expenses. Defendants did not

keep track of "rent" arrearages or overages.[17]  The fact that Debtors made mortgage payments totaling less than the purported "rent" from June 2014 to September 2016—increasing the arrearage for more than two years—is evidence that Defendants did not monitor the rent arrearages and/or did not care about it. Likewise, the fact that Justin Vasvick "reimbursed" Debtors for some expenses (like real estate taxes) but not others (like deck and roof repairs) also shows that Defendants were not monitoring lease obligations.  Additionally, Justin Vasvick's failure to acknowledge rental income on his tax return and honor the covenant in his mortgage providing that he was not allowed to rent the Property also suggest that Justin Vasvick did not think of his parents as residential tenants.

Despite the evidence highlighted above, Defendants maintain that evidence received at the trials is not sufficient to establish any badges of fraud.  In their Amended Post-Trial Brief, Defendants focus their badges of fraud analysis on only those transfers that are actionable under section 548, ignoring the initial transfer of the Property from Debtors to Justin Vasvick and Debtors' conduct from 2007 until the maintenance and repair expenses they paid in 2015 and 2016.  While the Trustee may not recover for any transfers Debtors made to Justin Vasvick or for his benefit prior to December 15, 2014, the totality of the circumstances relating to the initial transfer and Defendants' pattern of behavior from 2007 to trial are relevant to determining whether Debtors made the actionable transfers with intent to hinder, delay or defraud creditors. The circumstances and chronology of events from 2007 to 2019 as highlighted above show Debtors' initial efforts to protect the Property from creditors and their ongoing effort to ensure that this asset—their home—remained secure.

------------------------

[17] Although Darrell Vasvick testified in May 2019 that he kept a record of Debtors' debt to Justin Vasvick, this testimony is inconsistent with his testimony in May 2018 and he did not disclose this written record to the Trustee.  The Court finds Darrell Vasvick's May 2019 testimony on this issue lacks credibility.

Defendants also argue that Debtors and Justin Vasvick exchanged "fair consideration" for the initial transfer and, when the Court considers all the payments, repairs and improvements, the evidence shows that Defendants exchanged roughly equivalent value for the transfers. Defendants suggest that this finding should preclude the Trustee from recovering under section 548(a)(1)(A). In its analysis, the Court considered Debtors' deed transfer, their payments to Justin Vasvick and his mortgage lender, their home repairs and improvements and Justin Vasvick's willingness to execute loan documents, "purchase" the Property, and make payments to the mortgage lender in reaching its decision. But these transactions—even if they show a roughly equivalent exchange of consideration—do not preclude the Court from finding that Debtors intended to hinder, delay or defraud creditors. See In re Sherman, 67 F.3d at 1355 n.6 (explaining that actual harm to creditors is not an element of a claim under 548(a)(1)(A). To the contrary, Debtors' payments to Justin Vasvick, his mortgage lender, repair and maintenance contractors, carpet sellers and installers—together with their control, use and possession of the Property, their efforts to hide the original source of some of these payments and Defendants' failure to treat their exchange of consideration as a genuine landlord tenant arrangement—demonstrate their wrongful intent.

Next, Debtors argue that they used available resources—including Darrell Vasvick's inheritance—to pay creditors, suggesting a lack of intent to hinder, delay or defraud them. While some of the bank statements show significant payments to creditors and Darrell Vasvick testified that Debtors made payments toward credit card debt, it appears that Debtors did not make payments toward their SBA debt since they defaulted in 2006 or 2007.

During the May 2019 trial, Darrell Vasvick testified that a banker at Vision Bank, where Debtors originated their SBA loan, told him in 2011 or 2012 that the SBA typically "writes off" bad loans and seldom "comes after" borrowers who default. He also maintains that he "never

thought SBA would come after us."  The Court does not find this hearsay statement credible, and it is not entirely convinced that Debtors relied on it.

Having considered the evidence in the context of the Trustee's claims and Defendants' responses, the Court finds that the Trustee established several badges of fraud, creating a presumption of fraud.  He also offered some direct evidence that Debtors intended to hinder, delay or defraud the SBA.

Once the Trustee establishes a presumption of fraud, the burden shifts to the transferee, Justin Vasvick, to prove some legitimate supervening purpose for the transfers.  Ritchie Capital Mgmt., LLC, 779 F.3d at 862.  "The burden which shifts is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged."  Kelly, 141 F.3d at 802 (citation and internal quotations omitted).

Defendants argue that the legitimate supervening purpose for the transfers to Justin Vasvick was the tenant/landlord relationship between Defendants as evidenced by their leases and consideration exchanges.  Evidence received in the first trial shows that Justin Vasvick knew his parents could not afford to make payments toward their mortgage as a result of their difficult financial position.  Drawing inferences based on all of the evidence received at both trials, the Court concludes that Defendants agreed Debtors should transfer the Property to Justin Vasvick but otherwise maintain the pretransfer status quo with Justin Vasvick assisting Debtors with the mortgage payments as necessary.  The oral lease was fictitious, and Defendants ignored the provisions of the written lease, demonstrating that they signed it only to support Debtors' ongoing efforts to protect the Property from SBA and perhaps other creditors.  The purported leases do not constitute a legitimate supervening purpose for the transfers.  Defendants failed to rebut the presumption of fraud.

19

Likewise, Justin Vasvick failed to meet his burden of proving an affirmative defense under section 548(c).  To meet this burden, Justin Vasvick must show that he gave value in exchange for the transfer and accepted the transfers in good faith.

11 U.S.C. § 548(c); see Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 67 (Bankr. D. Minn. 2012); In re McLaren, 236 B.R. at 901–02.

The Bankruptcy Code does not define good faith.  Doeling v. Grueneich (In re Grueneich), 400 B.R. 688, 693 (B.A.P. 8th Cir. 2009) (citing In re Sherman, 67 F.3d at 1355). Whether a transferee acted in good faith is a factual determination courts make on a case-by-case basis.  Id. (citation omitted).

> "To determine whether a transferee acts in good faith, courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.  In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."

Meeks v. Red River Entm't of Schreveport (In re Armstrong), 285 F.3d 1092, 1096 (8th Cir. 2002) (quoting In re Sherman, 67 F.3d at 1355); see also In re Grueneich, 400 B.R. at 693 (citation omitted).  A transferee's clear involvement in fraud can prevent the transferee from asserting certain defenses, including good faith.  Sarachek v. Crown Heights House of Glatt, Inc. (In re Agriprocessors, Inc.), 521 B.R. 292, 302 (Bankr. N.D. Iowa 2015) (citations omitted).

For the same reasons discussed above, the Court is not convinced that Justin Vasvick acted in good faith.  After considering the totality of circumstances from 2007 to the second trial in May 2019, the Court finds that Debtors transferred the Property to Justin Vasvick with intent to hinder, delay or defraud the SBA.[18]  Since then, Debtors have treated the Property as

---

[18] Defendants argue: "The Court can only conclude the Debtors made a fraudulent transfer to Justin Vasvick if the Court overrules its earlier findings, and instead finds the Debtors intentionally [paid] more than market rate for housing, or Debtors failed to receive full credit for the repairs against their rent due to Justin Vasvick."  Doc. 72 at 9.  This claim distorts the law of section 548(a)(1) and mischaracterizes the Court's findings in the first trial.  In the first phase of the litigation, the cause of action (unjust enrichment) did not require the Court to make any

their own—resided in it, made most of the mortgage, insurance and property tax payments (either directly or indirectly), maintained it and improved it.  Justin Vasvick knew about Debtors' financial situation and participated in their efforts to protect the Property.  Justin Vasvick did not act in good faith in accepting the transfers.  The Trustee met his burden under section 548(a)(1)(A), and Defendants failed to meet their burden.

The next question is:  Which transfers may the Trustee avoid pursuant to section 548(a)(1)(A)?  In his Complaint, the Trustee seeks to recover $24,041.96 in improvements to the property and "all other improvements or maintenance of the Property."  Doc. 1 at 6.  During the first and second trial, the Trustee established that Debtors paid Rokke Construction a total of $23,302.96 for repairs to the deck and roof benefiting Justin Vasvick as the transfer beneficiary.  He also offered evidence showing that Debtors spent $9,686 on carpet, materials and installation to replace carpet their dog ruined.  T-28 at 606.  As with the repairs to the deck and roof, Debtors' payment of this expense benefited Justin Vasvick as a transfer beneficiary.  All of these expenses fall within the scope of "improvements or maintenance" alleged in the Complaint.  The Trustee may avoid these payments under section 548(a)(1)(A).

In his pretrial brief, the Trustee provided an itemized statement of damages, which includes Debtors' roof and deck repair payments and carpet replacement expenses the Trustee may avoid.  <u>See</u> Doc. 68 at 7-8.  The list also includes real property taxes and homeowner's insurance.  The Trustee's Complaint does not give fair notice that he was seeking to avoid the latter transfers.

_____

determinations regarding Defendants' intent.  On the other hand, intent is the only element at issue in the second phase of the litigation—whether Defendants intended to hinder, delay or defraud creditors.  Thus, the Court is not required to overrule any of its prior findings but instead is required to make a new finding related to Defendants' state of mind.  The Court highlighted this distinction in the first trial when it noted that while Defendants' conduct "raise[d the Court's] suspicion," the Court was not required to judge Defendants' credibility or intentions in the abstract and did not do so.  <u>See</u> Doc. 40 at 18.

Near the end of the trial day, the Trustee made an oral motion to amend his Complaint to conform to the evidence.  He asked that the Court allow him to amend his Complaint to include Debtors' carpet-related expenses as well as the payment of real estate taxes and homeowner's insurance.  The Court previously concluded that carpet-related expenses fall within the scope of the remedy the Trustee sought in the Complaint.  Even if these expenses do not fall within the scope of the Complaint, the Trustee's motion to amend his complaint to conform to the evidence is granted as to carpet expenses only.  Defendants were on notice of the Trustee's efforts to avoid this transfer since the May 2018 trial.  They are not prejudiced by this amendment.

The Trustee's efforts to avoid property tax and homeowner's insurance payments did not arise until May 2019.  It appears that Defendants did not receive notice of this claim until they received the Trustee's pretrial brief.  See Doc. 68.  Pursuing these transfers at this late date is prejudicial to Defendants.  The Trustee's motion to amend his Complaint to conform to the evidence is denied as to these claims.

The Court considered all other arguments and finds them unpersuasive or unnecessary to discuss.

## IV.    CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Trustee is entitled to judgment against Defendant Justin Vasvick in the sum of $32,988.96 on his cause of action under section 548(a)(1)(A).  Judgment may be entered accordingly.

Dated:  July 25, 2019.


SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT